McCALEB, Chief Justice.
On or about June 14, 1969, 5,397 bushels of oats harvested for Lookaway Farm were delivered to Caldwell Port Elevator, Inc., for storage. On June 16, 1969 one of the owners of Lookaway Farm, Mrs. Mary Louise Snellings, went with her son to sack some of the oats, at which time they found that the oats were so contaminated as to render them unsalable.
This suit was thereafter instituted by Lookaway Farm against Caldwell and its insurer, Bituminous Casualty Corporation, to recover $2,336.41, for the loss suffered by it as a result of the defective condition of the oats.
Defendants admitted that plaintiff had sustained the loss in the amount alleged, and that said loss resulted from the negligence and fault of Caldwell. However, the insurer denied that the loss incurred was *555 covered by the policy issued by it to Caldwell.
The district court rendered judgment in favor of plaintiff against both defendants as prayed for. Caldwell did not appeal. However, on an appeal taken by the defendant insurer the Court of Appeal reversed the judgment as to it, dismissing plaintiff’s suit. 242 So.2d 620. We granted certiorari. 257 La. 856, 244 So.2d 609.
The insuring agreement between Caldwell and Bituminous is designated a “General Liability-Automobile Policy.” Among its provisions it recites that:
“This insurance does not apply:
******
“(1) to property damage to
* * * * * *
“(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control; but
“ * * * part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured; * *
The defendant insurer contends that the quoted clause excluded coverage for the plaintiff’s property which was in the care, custody and control of Caldwell. Conversely, counsel for plaintiff argue that, since the damage occurred as a result of contamination in the elevator which Caldwell used to convey the oats to the storage bins, the loss is covered because it arose out of the use of an elevator and, hence, falls within the exception to the exclusion clause.
The insurer counters by pointing out that the mechanical hoisting device used by Caldwell to transport the grain to the storage bins is not an “elevator” as specified in the definitions section of the policy. Therein “elevators” are described as follows:
“ * * * ‘elevator’ means any hoisting or lowering device to connect floors or landings whether or not in service, and all appliances thereof including any car platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an automobile servicing hoist, or a hoist without a platform outside building if without mechanical power or if not attached to building walls, or hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;”
*557 The questions thus posed are: (1) Did the contamination occur in connection with the use of Caldwell’s mechanical device; and (2) is the mechanical hoist an elevator within the terms of the policy ?
The record reflects that the operation of Caldwell’s business involved the use of a mechanical hoisting device which, as explained by E. J. Hodgkins, Caldwell’s president, consists of two vertical “square pipes”, in close proximity to each other, through which runs a belt to which buckets or “cups” are riveted. The operation of the mechanism results in the continuous raising and lowering of the buckets. At the base of the hoisting device is a shed where grain is brought by trucks for storage or another disposition. As the grain is loaded into the buckets it is raised to an upper level of the hoist, where is located a “turnhead” which can be set so that from that point, the grain may be emptied out of the buckets into one of several inclined pipes connected to the hoist. By this means the grain may be diverted from the buckets into either of two storage bins, to a “road outlet tank” to be loaded on trucks, or to the river part of the operation for loading on barges.
When plaintiff’s grain was delivered to the plant it was diverted into one of the storage tanks.
We have no hesitancy in resolving the first question in favor of plaintiff. Although plaintiff was not in control of the premises, and therefore was at a disadvantage in acquiring information as to what occurred, we find that the evidence adduced by it was sufficient to establish the contamination existing in the lifting mechanism. No evidence was offered by the insurer to establish that it might have, or did, occur elsewhere on Caldwell’s premises. Mr. Hodgkins did, at one point, testify that the contamination occurred “somewhere in the facility” and that he did not have any way of knowing where. But taken as a whole his testimony, both before this statement and afterward, clearly indicates that by the “facility” he meant the hoisting device — not the entire operation. Thus, when called on cross-examination by plaintiff he conceded that there was trash and foreign matter in the working mechanism of the lifting device. And in answer to questions of defense counsel, he specifically disclaimed the possibility that it had come from the storage bins and also ruled out any “either/or” suggestion of counsel as to where the damage occurred.
Moreover, Mrs. Snellings testified that when she discovered the contamination in the oats she personally observed the “contamination in the operating mechanism of the Elevator.”
The question of whether the lifting device was an elevator within the terms of the policy presents a more troublesome *559 problem, primarily because the policy definition of that term is far from clear as to the type of elevator intended to be covered.
Undoubtedly, the hoisting device is an elevator within the commonly accepted use of that term. In fact, in Webster’s Third New International Dictionary (1961 Edition) a contraption very similar to that used by Caldwell is pictured as an example of an elevator.
Imprimis, we reject the holding of the Court of Appeal that the device here involved is in the nature of an “inclined conveyor”, and therefore excluded from the policy’s definition of “elevator”. “Inclined” specifically connotes a deviation, leaning or slope from the vertical or horizontal.[1] While the pipes into which the buckets of the hoist empty are inclined, the lifting apparatus itself is vertical.
Nor does the language describing an elevator as a “hoisting or lowering device to connect floors or landings” describe a mechanism other than the one involved here. The policy does not say that it must connect floors of a building. In our opinion, the use of the words “or landings” indicates something in addition to floors or “stories” of a building. This hoist does connect the landing, where the grain is delivered, to the level where the turnhead is located.
Besides, we think the language contained in the “hazards covered” section of the policy supports plaintiff’s contention that its hoist falls with the cited definition of an elevator. Not only is “Grain Elevator Operation” covered but, in addition thereto, is set forth “ELEVATORS” for which an additional premium was paid. Under the hazard covered for “ELEVATORS” is listed “Hoists — hydraulic or mechanical— used for dumping material from trucks.” This, we think, is a clear interpretation of the policy by the party writing it that the hoisting device used here is an elevator within its intendment and that an “elevator” is not limited to one which operates between floors or stories of a building, as contended by the insurer.
In their brief to this Court defendant’s counsel argue that Caldwell’s “facility is a warehouse pure and simple.” They declare “It was the intent of the insurer to insure the legal liability of a warehouse but to exclude from its coverage property of others within the care, custody and control of the insured.” Undeniably, Caldwell operated a warehouse or storage place for grain. But in carrying out its business it used an elevator — so much so that the entire operation is commonly referred to as a “grain elevator.” And from the intent to exclude liability for property of others in the care and control of Caldwell was specifically *561 excluded property damage arising cwf of the uze of an elevator.
We conclude, therefore, that the loss involved here was covered by the policy issued by defendant.
For the reasons assigned the judgment of the Court of Appeal is reversed and set aside and the judgment of the district court is reinstated and affirmed. All costs in this proceeding are to be borne by Bituminous Casualty Corporation.
DIXON, J., recused.

. See Webster's Third New International Dictionary (1961 Edition).